**UNITED STATES of America,**
**Appellee,**

v.

**Owsley STANLEY, Robert W. Massey,**
**Robert D. Thomas, Appellants.**

**No. 25473.**

United States Court of Appeals,
Ninth Circuit.

April 5, 1971.

As Amended on Denial of Rehearing
Aug. 5, 1971.

---

Michael H. Metzger (argued), Daniel H. Weinstein, San Francisco, Cal., Arthur Harris (argued), (for Thomas), Berkeley, Cal., Henry B. Rothblatt, New York City, Al Matthews (for Massey & Spires), Van Nuys, Cal., J. Bradley Klemm, Oakland, Cal., for appellants.

Paul Sloan (argued), Asst. U. S. Atty., James L. Browning Jr., U. S. Atty., San Francisco, Cal., for appellee.

Before CHAMBERS, MERRILL and CARTER, Circuit Judges.

JAMES M. CARTER, Circuit Judge.

The convictions of the three appellants above named, and William A. Spires, were affirmed in United States v. Stanley, (9 Cir. 1970) 427 F.2d 1066. All four petitioned for *certiorari* and on December 7, 1970, the Supreme Court granted the petition "insofar as it seeks review of affirmance by the Court of Appeals of count 5 (possession count) of convictions of petitioners Stanley, Thomas, and Massey. Judgment as to these three individuals vacated insofar as that count is concerned and case remanded to the Court of Appeals so that it may consider suggestions contained in the memorandum the Solicitor General filed here. By this remand this Court intimates no view as to merits of the Solicitor General's position. In all other respects the petition for writ of certiorari is denied." Stanley v. United States, 400 U.S. 936, 91 S.Ct. 234, 27 L.Ed.2d 242 (1970). Mr. Justice White and Mr. Justice Blackmun dissented and would deny *certiorari;* Mr. Justice Douglas wrote a dissent from the remand and would have denied *certiorari.*

The case is not before us as to Spires, as to whom *certiorari* was denied as to all counts. On remand we are asked to consider the conviction on count 5 (possession) as to Stanley, Massey and Thomas. We find ourselves in agreement with Mr. Justice Douglas in his dissent, and accordingly reaffirm the conviction of Stanley, Thomas and Massey as to count 5.

The Solicitor's memorandum states, page 6:

"Petitioners attack their separate convictions and consecutive one year sentences for both the manufacture and possession of LSD, *where possession was merely incidental to manufacture.*" [Emphasis added]

The Solicitor then recognizes that manufacture and possession may be treated as separate offenses, because each requires proof of a fact which the other does not, and that our decision was constitutionally correct under Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306. The Solicitor states that recent decisions of the Supreme Court indicate "that even where one act can be said to give rise to separate offenses, there still is a question

whether Congress intended that it be treated as such." He then examines the legislative history concerning the statutes involved.

On page 8, he states: "It thus seems that the sections prohibiting possession, 21 U.S.C. 331(q) (3), 360a(c), were intended to establish an alternate method of accomplishing the purpose of the statute—that is, to curtail the distribution of these drugs—and not to increase the penalties of those manufactured drugs *whose possession occurred in the process of manufacture."* [Emphasis added] He concludes, "Consequently, consecutive sentences for both manufacture and possession were not proper in this case where possession was solely incident to manufacture."

Mr. Justice Douglas, in his dissent, clearly answers the contention. He states that through the search there was found a brown bottle containing 472 grams of white powder, which contained 5.3% LSD, and also a plastic bottle containing 42 grams of 95% pure LSD. He then points out that the government charged each petitioner with manufacture of LSD, *possession of LSD* and conspiracy to manufacture, etc. LSD. He then states:

"[T]he Court of Appeals concluded that the evidence was overwhelming that the *possession was for purposes of sale."*

"We distort the record when we treat the case as 'possession' of a drug for purposes of manufacture. We deal with a drug after it was manufactured and held for sale. The charge of 'possession' made in the indictment was therefore 'possession' as defined in the 1965 Act." 400 U.S. at 937–938, 91 S.Ct. at 235.

In order to manufacture LSD, it is necessary to start with a base of lysergic acid. Building blocks, for example ergot alkaloids, are then used and through synthesis there is obtained LSD contained in a liquid. The liquid can then be converted to powder and cut by the addition of inert substances, and finally can be made into tablet form.

Count 5, with which we are here concerned, charged the possession of approximately 67.78 grams of LSD. Exhibit 11 contained a gross of 472 grams of powder material which was 5.3% pure LSD. It is apparent that as to this Exhibit the inert substances had been added and the material converted to powder form. Computation shows that in the 472 grams of material, there was approximately 24 grams of LSD. Exhibit 18 contained 42 grams of gross powder material, which was 95% pure LSD, indicating that probably some small amount of inert material had been added. Thus by computation, there were approximately 39.9 grams of LSD in Exhibit 18. The total of LSD in Exhibits 11 and 18 was approximately 63.9 grams of LSD, whereas Count 5 of the information alleged 67.58 grams of LSD. The difference in amount is immaterial.

It is thus apparent that starting with lysergic acid, LSD *had been manufactured* and in each exhibit was in powder form. The fact that there could be further processing, for example by "cutting" the LSD and adding diluents or by tableting it or by putting it into capsules, does not negate the fact that the *manufacturing* of LSD had been completed. As pointed out by Justice Douglas, the 42 grams of 95% pure LSD at the price quoted by Spires would bring in $105,000 and if sold in lesser quantities would bring in more.

It is true that Spires had sold only tablets to Krusko in 1967, (Counts 2 and 3 of the Information), but this does not mean that there was no intention to sell anything but tableted LSD. Appellant Stanley had expressed his desire to produce only the purest and cleanest LSD to be distributed to his family and friends. This would mean LSD with a minimum of diluents or inert substances.

The record also shows that on many occasions agent Krusko, and Spires had negotiated for *grams* of LSD as opposed to tablets. It is entirely possible that

the appellants intended that all or part of the 67 grams of LSD in powder form or portions thereof were to be processed into tablets. However, circumstances surrounding the entire drug operation lead to the conclusion that LSD was ready for sale and that it could and would have been sold in the form that it was in, to the proper party for the proper price.

Appellants suggest that LSD is not sold except in tablet form. The contention is erroneous. In Erlin v. United States, (9 Cir. 1969) 413 F.2d 1036, this court affirmed the conviction of the defendant for selling 26 grams of LSD in powder form. The opinion does not indicate that it was in powder form but the court may take judicial notice that the information alleged the sale of 26 grams of "LSD powder."

The statute, 21 U.S.C. §§ 331(q) (1), 360a(a) and the regulations proscribed the manufacture of LSD without reference to particular form the drug may have. Starting from the base of lysergic acid which is not LSD, there had been manufactured LSD which was in powder form.

Count 5 concerned itself with possession for sale. As stated by Justice Douglas, although the district judge did not make a specific finding that the possession of LSD was for the purpose of sale, this court concluded that the evidence was overwhelming that the possession was for that purpose, 427 F.2d 1066–1071.

The Solicitor misapprehended the facts, when on page 7 of his memorandum he states that the purpose of the 1965 statute prohibiting possession was "not to increase the penalties of those manufacturing drugs whose possession occurred in the process of manufacture." [Emphasis added] He assumed that the powder in both bottles was in the manufacturing stage and ignored the fact that LSD had already been manufactured and was ready for sale.

The judgments are affirmed.